# CRIMINAL COMPLAINT

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

FILED
CLERK, U.S. DISTRICT COURT
APR - 7 2011
CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

| UNITED STATES OF AMERICA | DOCKET NO. |
|---|---|
| v. | |
| RAOUL JOSEPH GERMAIN | MAGISTRATE'S CASE NO. |
| | 011- 11 0737M |

LODGED
2011 APR -7 PM 12:51
CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

Complaint for violation of Title 18, United States Code, section 666(a)(1)(B)

| NAME OF MAGISTRATE JUDGE | | |
|---|---|---|
| THE HONORABLE STEPHEN J. HILLMAN | CHIEF UNITED STATES MAGISTRATE JUDGE | LOCATION Los Angeles, CA |

| DATE OF OFFENSE | PLACE OF OFFENSE | ADDRESS OF ACCUSED (IF KNOWN) |
|---|---|---|
| November 15, 2010- April 7, 2011 | Los Angeles County | |

**COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE VIOLATION:**

Beginning on a date no later than on or about November 15, 2010, and continuing until on or about April 7, 2011, in Los Angeles County, within the Central District of California, and elsewhere, defendant RAOUL JOSEPH GERMAIN corruptly solicited, demanded, and agreed to accept cash bribery payments from an undercover Special Agent of the Federal Bureau of Investigation, intending to be influenced and rewarded in connection with the business, a transaction, or a series of transactions of the City of Los Angeles Department of Building and Safety, involving a thing of value of $5,000 or more, namely, cash payments totaling approximately $6,000, in violation of Title 18, United States Code, section 666(a)(1)(B).

**BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:**

(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE:

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT TERESA L. BRAND |
|---|---|
| | OFFICIAL TITLE Special Agent - Federal Bureau of Investigation |

| Sworn to before me and subscribed in my presence, | | |
|---|---|---|
| SIGNATURE OF MAGISTRATE JUDGE(1) | | DATE April 7, 2011 |

1) See Federal Rules of Criminal Procedure rules 3 and 54.

JOSEPH N. AKROTIRIANAKIS, Assistant United States Attorney   REC: Detention

A F F I D A V I T

I, Teresa L. Brand, being duly sworn, hereby declare and state:

1.    I am a Special Agent ("SA") of the Federal Bureau of Investigation ("FBI"), and I have been so employed since January 8, 2006.  I graduated from the FBI's academy in Quantico, Virginia, in May 2006.  In my present assignment, I investigate violations of federal criminal law, including corruption offenses by state and local government officials.  I have been the principal case agent in several investigations of public corruption offenses.  These investigations have involved diverse investigative techniques, including the making of consensual recordings and the use of confidential human sources.

PURPOSE OF AFFIDAVIT

2.    This affidavit is made in support of a criminal complaint against, and a request for the issuance of a warrant for the arrest of, RAOUL JOSEPH GERMAIN ("GERMAIN"), an inspector employed by the City of Los Angeles Department of Building and Safety.  As described herein, GERMAIN has corruptly solicited, demanded, accepted, and agreed to accept monetary bribe payments in connection with his official duties as an inspector for the City of Los Angeles, in violation of Title 18, United States Code, Section 666.

3.    This affidavit is intended only to establish probable cause to support a criminal complaint against GERMAIN, and it

1

does not purport to include all known information concerning this investigation, all criminal offenses committed by GERMAIN, or all bribes corruptly solicited, demanded, and accepted by him. Conversations referenced herein are related in part and, except where quotation marks are used, in substance only. Monetary figures and calculations set forth herein are approximations unless otherwise expressly stated.

BASIS FOR AVERMENTS

4.   The facts set forth in this affidavit are based upon my own personal observations and my training and experience, as well as my review of information obtained during this investigation from other sources, including: (a) statements made or reported by various witnesses with personal knowledge of relevant facts; (b) statements made or reported by an undercover FBI agent; (c) recordings of conversations to which GERMAIN was a party and, to the extent those conversations were conducted in the Spanish language, English translations of the Spanish portions of any such conversations; (d) documents and records; and (e) summaries and analyses, prepared by others, of documents and records.

TITLE 18, UNITED STATES CODE, SECTION 666

5.   Title 18, United States Code, Section 666 provides, in relevant part, as follows:

(a)   Whoever, if the circumstance described in subsection (b) of this section exists —

(1)   being an agent of an organization, or of

2

a State, local, or Indian tribal government, or any
agency thereof —

. . .

(B) corruptly solicits or demands for
the benefit of any person, or accepts or agrees to
accept, anything of value from any person, intending to
be influenced or rewarded in connection with any
business, transaction, or series of transactions of
such organization, government, or agency involving any
thing of value of $5,000 or more ... [and]

(b)  . . . the organization, government, or agency
receives, in any one year period, in excess of $10,000
under a Federal program involving a grant, contract,
subsidy, loan, guarantee, insurance or other form of
Federal assistance, . . . shall be fined under this
title, imprisoned not more than 10 years, or both.

LOS ANGELES DEPARTMENT OF BUILDING AND SAFETY

6.    The City of Los Angeles is a local governmental agency
within the meaning of 18 U.S.C. § 666(a)(1) and (d)(2), (3).  The
Los Angeles Department of Building and Safety ("LADBS") is a
department within the City of Los Angeles.  According to the
Office of Los Angeles Mayor Antonio R. Villaraigosa, LADBS, among
other things, "enforces all ordinances and laws relating to the
construction, alteration, repair, demolition, removal or
relocation of buildings or structures" in Los Angeles and

"provides reports of residential building records . . . to potential purchasers prior to sale or exchange and inspects residential property on request to determine its compliance with City code requirements." According to LADBS' Internet website, every year LADBS "[r]eviews and approves plans for over 36,400 projects," "[c]onducts over 800,200 inspections," and "[i]ssues over 110,900 permits with an estimated valuation of over $2.5 billion." LADBS has 12 offices throughout the City of Los Angeles and employs more than 315 inspectors, including GERMAIN. LADBS inspectors are authorized to act on behalf of LADBS and, therefore, the City of Los Angeles. LADBS inspectors are "agents" of both LADBS and the City of Los Angeles.

CITY LOS ANGELES' RECEIPT OF FEDERAL ASSISTANCE

7.    I have reviewed the City of Los Angeles budgets for Fiscal Year 2009-10 ("FY 2009-10") and Fiscal Year 2010-11 ("FY 2010-11"), posted on the Internet website of Los Angeles City Controller Wendy Greuel. According to both budgets, "The City's fiscal year is July 1st through June 30th." During FY 2009-10, the City of Los Angeles received over $307 million in federal grants, with an additional nearly $170 million in federal grants with the State of California as a "pass through." During FY 2010-11, the City of Los Angeles is to receive over $324 million in federal grants, with more than an additional $218 million in federal grants with the State of California as a "pass through."

//

4

BACKGROUND REGARDING LADBS RESIDENTIAL CONSTRUCTION INSPECTIONS

8.    The investigation of GERMAIN included the use of an undercover FBI agent acting in the persona of a residential construction contractor named "Manny Gonzalez" ("UC").  In his undercover persona, UC was "employed" by a developer who constructs residences within the City of Los Angeles.  During the investigation, UC met with GERMAIN and other LADBS inspectors on several occasions and requested and obtained LADBS inspections of several residences constructed in South Los Angeles.  During the investigation, UC became familiar with the process of requesting and obtaining LADBS' inspections of ongoing residential construction projects.  I have discussed this process with UC.

9.    UC had informed me that developers who construct residences within the City of Los Angeles are required to obtain a certificate of occupancy for any newly constructed residence before that residence may be occupied.  Certificates of occupancy are obtained through an application process that includes, among other things, the City's issuance of a building permit and construction inspections by LADBS inspectors at different phases of the construction process, such as (a) footing inspections; (b) rough inspections of, among other things, electrical, plumbing, roof sheathing, framing, insulation, exterior and interior lathing, and drywall; and (c) final inspections of, among other things, electrical, plumbing, gas, and fire sprinklers. The physical building permit LADBS issues to the developer is a

document, printed on card stock, entitled "LADBS Inspection Record." In the field, contractors and inspectors generally refer to the physical permits as a "card." Typically, there are two permit cards associated with a residence that has a garage. Occasionally, there is an additional permit card for the demolition of a structure that exists on a property prior to new construction. After a phase of construction passes inspection, the inspector signs and dates the permit cards next to the line item that has passed inspection. These results are then entered into a computer database maintained by LADBS and accessible through the "Online Services" page of LADBS' Internet website, ladbs.org. In the field, contractors and inspectors generally refer to the computer database as LADBS' "system." Attached hereto as Exhibit A is photocopy of an exemplar LADBS Inspection Record (permit card).

10. UC has also informed me that a request to schedule a required inspection must be made through LADBS' automated telephone appointment system prior to 4:00 p.m. the day before the requested inspection. The morning of the day of the inspection, the party requesting the inspection receives a telephone call and is provided a two-hour window within which an LADBS inspector will arrive to perform the requested inspection. Inspection and approval of the completion of one phase of construction is required before construction can continue on the next phase. Delays in obtaining such approvals results in

increased construction costs.

STATEMENT OF PROBABLE CAUSE

11.  This investigation included the receipt of information from a confidential informant ("CI").  CI is a work site supervisor for a residential property developer who develops approximately 80-100 residential properties in the City of Los Angeles each year.  CI informed me that GERMAIN and other LADBS inspectors accept monetary bribe payments in exchange for necessary permit approvals on residential construction projects within the City of Los Angeles.  According to CI, the soliciting, demanding, and accepting of bribe payments in exchange for inspection approvals is systemic within LADBS.

12.  According to CI, GERMAIN accepts bribe payments at the initial inspection stage of construction at a residential property.  A bribe paid at this stage will cover all necessary construction inspections related to that property, up to and including GERMAIN's final inspection of that property.  According to CI, other LADBS inspectors accept similar bribe payments, but the monetary amounts of the bribes required differs from inspector to inspector.

13.  CI estimates that he/she has personally made between 30 and 40 monetary bribe payments to LADBS inspectors.  In addition to having made monetary bribe payments, CI has: (a) purchased building materials to be used in residences of and/or other real properties owned by LADBS inspectors; (b) paid laborers to work

7

at properties owned by LADBS inspectors; and, (c) on one occasion, paid for a vacation for an LADBS inspector. CI states that he/she has never refused to pay a bribe in connection with any such property, because acquiescence to bribe demands avoids delays in the construction inspection process and, at least with certain LADBS inspectors, is the only way to pass inspections required in connection with residential construction projects. CI indicated that he/she has also had to bribe an LADBS inspector in connection with a property CI personally owns (and for which a construction inspection was required).

14.  After receiving the foregoing information from CI, the FBI began an undercover investigation of LADBS. During the investigation, UC approached GERMAIN while posing as a contractor in a role similar to CI's role with the developer by whom CI is employed.

CONSTRUCTION ON 79TH STREET, SOUTH LOS ANGELES

15.  On November 15, 2010, CI contacted GERMAIN by telephone and left a message. Later that day, GERMAIN returned CI's call. The ensuing conversation, which was conducted in the Spanish language, was audio-recorded. I have reviewed a translation of that recording. During the conversation, CI indicated to GERMAIN that CI had a "job" at an address on 79th Street, in South Los Angeles ("the 79th Street property"), and he wanted GERMAIN to "take it." GERMAIN asked when the job was to begin. CI indicated that he was starting that day and asked if GERMAIN

wanted CI to "set it up" for the following day.  GERMAIN answered
in the affirmative and agreed to take the "job."  That afternoon,
UC called LADBS' automated system to schedule a November 16, 2010
inspection of the 79th Street property.

16.  On November 16, 2010, at approximately 10:00 a.m.,
GERMAIN met CI and UC at the 79th Street property.  The meeting
was audio and video-recorded.  The conversation was in both the
Spanish and English languages.  I surveilled the meeting,
monitored the English portion of the audio recording, and have
since reviewed the audio/video recording and a translation of a
transcript of the Spanish portions of the conversation.  GERMAIN,
CI, and UC discussed bribery payments UC had previously made to a
different LADBS inspector, as well as GERMAIN's own acceptance of
bribery payments in the past.  During that discussion, GERMAIN
signed and dated "11-16-2010" on the "Footing Inspections"
section of the LADBS Inspection Records (permit cards) for the
79th Street property, although GERMAIN did not at any time
inspect the footings (or anything else) at the 79th Street
property on that date.

17.  During the same meeting, UC complained to GERMAIN about
the amounts of the monetary bribe payments he was required to pay
to another LADBS inspector.  GERMAIN provided his personal
cellular telephone number to UC and instructed UC to have him
perform future inspections for UC: "So from now on, if you get
anything from Century [Boulevard] down this way give me a call,"

apparently referring to the geographic area in which GERMAIN is authorized to conduct inspections on behalf of the City of Los Angeles.  Later during the same meeting, CI asked GERMAIN how much money GERMAIN required for his "inspection" of the 79th Street property:

| | |
|---|---|
| GERMAIN: | For here? |
| CI: | Yeah. |
| UC: | Yeah. |
| CI: | Let's make it . . . |
| GERMAIN: | 15 [$1,500]. |
| CI: | 15 [$1,500]? |
| GERMAIN: | That's it. |
| CI: | Ok. |
| UC: | That's it? |
| GERMAIN: | 15 [$1,500] yeah, cool. |
| UC: | Yeah. |
| GERMAIN: | That's you know . . . no other . . . I am not going to come back and say, "Hey I need more money." |

18.  GERMAIN then explained what CI and UC would receive in exchange for the $1,500 bribe payment to GERMAIN:

So . . . and I'll set . . . I'll . . . you don't have to call [LADBS' automated telephone appointment system], you don't have to do anything, you just go ahead and work.  . . . I set up all the inspections, I

give it -- I give it [LADBS' automated telephone
appointment system] a different phone number so you
don't get a phone call, you just go ahead and do the
work.  I drive by every once in a while, take a look, I
won't even stop and get off . . . .

19.  After GERMAIN confirmed that he had no intention of
actually inspecting the construction at the 79th Street property,
GERMAIN and UC agreed that, in the future, UC and GERMAIN would
deal directly with one another, i.e., without CI present.  In the
cab of UC' truck, UC provided his cellular telephone number to
GERMAIN, counted out $1,500 in $100 bills, and handed the money
to GERMAIN.  Attached hereto as Exhibit B are still photographs
taken from the video recording of UC's bribe payment to GERMAIN
for the 79th Street property.

20.  On December 15, 2010, UC spoke with GERMAIN by
telephone.  The conversation was audio-recorded.  I have listened
to the recording.  UC informed GERMAIN that the 79th Street
property was ready for the inspection of the next phase of
construction.  GERMAIN stated that he would set up the
inspection.  During the same telephone conversation, UC informed
GERMAIN about an upcoming residential construction project at an
address on 43rd Street in South Los Angeles ("the 43rd Street
property").  GERMAIN stated that he would have the 43rd Street
property assigned to himself in LADBS' inspection appointment
system.

CONSTRUCTION ON 43RD STREET, SOUTH LOS ANGELES

21.   The next day, December 16, 2010, GERMAIN called UC and requested the permit numbers for the 43rd Street property.   The ensuing conversation was audio-recorded.   I have listened to the recording.

22.   On Monday, December 27, 2010, UC spoke with GERMAIN by telephone.   The conversation was audio-recorded.   UC indicated that he intended to begin digging footings on the 43rd street property the next day and wanted to pour the concrete footings over the next weekend.   (Prior to the pouring of concrete footings, inspection and approval of the footing excavation and the placement of footing forms and reinforcing steel is required.)   GERMAIN stated that he would meet UC out at the property the following day.

23.   On the morning of December 28, 2010, GERMAIN met UC at the 43rd Street property.   The meeting was audio- and video-recorded.   I surveilled the meeting and have reviewed the audio/video recording.   UC has informed me that, at the time of the meeting, neither the footing forms nor the reinforcing steel had been placed, and the footing excavation was incomplete. During the meeting, however, GERMAIN requested UC's LADBS Inspection Record (permit card) for the 43rd Street property and signed off the "Footing Inspection" portion of the form, indicating that the footing excavation, forms, and reinforcing steel had all been completed and inspected and were approved.

GERMAIN dated the approval "12-28-10".  GERMAIN instructed UC to
continue with the construction of the 43rd Street property, to
"take it up to the 'roughs' [rough inspections phase], . . . and
keep on going, just let me know what's going on."

24.  Later during the same meeting, and without ever having
left the 43rd Street property, UC informed GERMAIN that the 79th
Street property was ready for inspection of the interior/exterior
lathing.  GERMAIN indicated that he "remembered" the 79th Street
property.  UC handed GERMAIN the LADBS Inspection Record (permit
card) for the 79th Street property, and GERMAIN signed for the
rough inspection of the electrical, electrical life safety,
plumbing, fire sprinkler, heating & refrigeration, roof
sheathing, and framing for the 79th Street property, dating the
inspections "12-28-10."  GERMAIN also signed for rough inspection
of exterior lathing, interior lathing, and drywall.  For these
inspections, GERMAIN forward-dated the permit card to read "12-
29-2010."  (According to UC and CI, GERMAIN had never returned to
the 79th Street property with either UC or CI at any time after
the November 16, 2010 meeting at which GERMAIN received the
$1,500 payment from UC.)

25.  After signing the inspection record to the 79th Street
property, GERMAIN asked UC, "Alright, we're all set?"  UC
responded, "Cool.  Fifteen [$1,500] right?"  GERMAIN replied,
"Yeah," and then "That's OK, I trust you," when UC began counting
out the bribe payment.  After UC handed GERMAIN the $1,500 bribe

13

payment, GERMAIN stated that they would "do the same thing" with the 43rd Street property as they had on the 79th Street property: "Keep on going, just give me a phone call and say, 'Hey, you know, um, I need my roughs this,' or, I . . . I won't always come out, I'll just put it in the computer, and we'll keep on going." Attached hereto as Exhibit C are still photographs taken from the video recording of UC's bribe payment to GERMAIN for the 43rd Street property.

26.  On January 13, 2011, UC called GERMAIN and left a message indicating that he would begin two additional residential construction projects the next week.

27.  On January 19, 2011, UC spoke with GERMAIN by telephone.  The conversation was audio-recorded.  I have listened to the recording.  During the conversation, UC informed GERMAIN that the framing at the 43rd Street property had been completed, and that the 79th Street property would be ready for final inspection the following week.  GERMAIN requested that UC call LADBS' automated telephone appointment system to schedule inspections for the 79th Street property and the 43rd Street property, but instructed UC to continue the construction at those properties, i.e., to begin next phases of construction, in the meanwhile.

CONSTRUCTION ON 77TH STREET AND 87TH PLACE, SOUTH LOS ANGELES

28.  During the recorded telephone conversation on January 19, 2011, UC also gave GERMAIN the addresses for the two

14

additional upcoming residential construction projects, one at an address on 87th Place ("87th Place property") and the other at an address on 77th Street ("77th Street property"), both in South Los Angeles.  GERMAIN stated that he would sign off on the footing inspections for the 87th Place property and the 77th Street property "on Friday," i.e., January 21, 2011.  UC and GERMAIN agreed to meet on the morning of January 21, 2011.

29.  On January 20, 2011, UC spoke with GERMAIN by telephone at approximately 3:47 p.m.  The conversation was audio-recorded. I have listened to the recording.  During the conversation, UC informed GERMAIN that he (UC) had not called LADBS' automated telephone appointment system to schedule the footing inspections for the following day at the 87th Place property and the 77th Street property.  GERMAIN stated he would schedule the inspections himself and instructed UC to call him back and leave the addresses on his voicemail.  UC Gonzales has informed me that he complied with this instruction.

30.  UC informed me that, on the morning of January 21, 2011, GERMAIN left UC a voicemail message indicating that he would meet UC at the 77th Street property around 11:00 a.m. that day.  UC returned the call and left GERMAIN a message stating that he (UC) wanted to meet earlier and requested that GERMAIN call him back.  GERMAIN returned the message, and the conversation was audio-recorded.  I have listened to the recording.  GERMAIN agreed to meet UC at 10:00 a.m., at the 87th

15

Place property (rather than the 77th Street property).

31.   Later that morning, GERMAIN met UC in the street in front of the 87th Place property.  The meeting was audio and video-recorded.  I surveilled the meeting, monitored the audio recording, and have since reviewed the audio/video recording. Across the street from the 87th Place property, UC handed GERMAIN the LADBS Inspection Records (permit cards) for the 87th Place property and the 77th Street property.  GERMAIN signed off on the footing inspections for both the 87th Place property and the 77th Street property without even having inspected the footings at the 87th Place property or, for that matter, stepping foot on the 87th Street property, and without ever having gone to the 77th Street property.

32.   After signing off for the footing inspections for the 87th Place property and the 77th Street property, GERMAIN then asked UC, "So, what else do you need?"  UC responded, "79th . . . we are at final."  GERMAIN signed the final inspection portion of the LADBS Inspection Record (permit card) for the 79th Street property, and stated, "So those are the finals on those." (GERMAIN signed the LADBS Inspection Record card for the 79th Street property for the following final inspections: "Electrical," "Electrical Life Safety," "Plumbing," "Gas," "Gas Test," "Heating & Refrigeration," "Elevator," "Fire Sprinkler," "Disabled Access," "LAFD (Title 19 only)," "LAFD Fire Life Safety," "Pool Final," "AMQD sign-off provided," and "Project

16

Final" with the future date "1-24-11."  Again, according to UC
and CI, GERMAIN had never returned to the 79th Street property
with either UC or CI at any time after the November 16, 2010
meeting at which GERMAIN received the $1,500 payment from UC.)

33.  After GERMAIN signed off on the final inspections for
the 79th Street property, UC stated, "OK, sweet," and then added,
"And then 43rd, um, we're at roughs."  UC handed GERMAIN the
LADBS Inspection Record (permit card) for the 43rd Street
property.  GERMAIN responded, "OK," and then signed the rough
inspection portions of the LADBS Inspection Record (permit card)
for the 43rd Street property and dated the record to read "1-20-
11."  (According to UC, GERMAIN had never returned to the 43rd
Street property with UC at any time after the December 28, 2010
meeting at which GERMAIN received the $1,500 payment from UC.)

34.  Later during the same meeting, UC informed GERMAIN that
he wanted to "speed up things" with the completion of his
residential construction projects.  GERMAIN informed UC, "That's
what you have me for here."  GERMAIN indicated to UC that, after
the footing inspections, UC could simply call him for the final,
which UC understood to mean that GERMAIN would sign off on the
final inspections and then backdate the intermediate "rough"
inspections.  GERMAIN stated that "we'll push them right
through."

35.  GERMAIN and UC then went into the cab of UC's truck.
UC counted out $3000 in $100 bills and handed the money to

17

GERMAIN.  GERMAIN placed the bribe money in his shirt pocket and informed UC, "Just keep on going on these jobs."  Attached hereto as Exhibit D are still photographs taken from the video recording of UC's bribe payment to GERMAIN for the 77th Street property and the 87th Place property.

GERMAIN'S COVER-UP ATTEMPTS

36.  On February 14, 2011, UC and GERMAIN spoke telephonically.  The conversation was audio-recorded.  I have listened to the recording.  UC informed GERMAIN that LADBS had issued an order that all construction at the 43rd Street property be halted, because the construction at the property was in the "final" phase, but LADBS' computer database reflected approval of only the footing inspections and not the rough inspections GERMAIN had "approved" on January 21, 2011, as described above. GERMAIN indicated that he would find out why the stop work order had been issued.

37.  Later the same day, GERMAIN called UC.  The conversation was audio-recorded.  I have listened to the recording.  GERMAIN stated that he had spoken with a supervisor. According to GERMAIN, someone had gone to the 43rd Street property and observed that stucco (exterior) and drywall (interior) had been completed, even though the LADBS system did not reflect inspection of the insulation and lathing.  GERMAIN stated he would "handle" matters in the morning by falsely informing LADBS that he had actually inspected the property and

had simply failed to put the results for insulation and the lathes inspections in the system.  GERMAIN then instructed UC to provide him with the permit card, implying that he (GERMAIN) would falsify the record to support this contrived "cover" story.

38.  UC informed me that, on February 15, 2011, GERMAIN called UC and requested a meeting at the 43rd Street property. UC returned the call at approximately 9:30 a.m.  The ensuing conversation was audio-recorded.  I have listened to the recording.  GERMAIN and UC agreed to meet at the 43rd Street property at 11:00 a.m.  GERMAIN asked UC to bring the permit cards related to the 43rd Street property so GERMAIN could sign them.

39.  On the morning of February 15, 2011, GERMAIN met UC at the 43rd Street property.  The meeting was audio and video-recorded.  I surveilled the meeting and monitored the audio-recording.  I have since reviewed the audio/video recording. During the meeting GERMAIN described a false cover story that he and UC could tell in response to any inquiry related to the stop work order on the 43rd Street property.  GERMAIN's cover story was going to be that he had been at the 43rd Street property on January 27, 2011, in response to a complaint from a neighbor and, while at the property, saw UC.  GERMAIN would say that he performed some inspections without an appointment, gave verbal approval on the items inspected, and then simply neglected to enter the items in the LADBS computer database.  After describing

19

this cover story, GERMAIN stated, "So that's the story." GERMAIN then requested the permit cards for the property so he could sign and date them to make them consistent with the cover story he had just contrived. GERMAIN then said, "Let's go inside so we have some privacy." Once inside the house, GERMAIN reviewed the permit cards. After realizing that he had already signed the cards (on January 21, 2011, as described above), GERMAIN stated, "Hey, I already signed these . . . [chuckling] good, I'm glad," referring to certain rough inspections indicated on the permit cards. Although he performed no inspections at the 43rd Street property on February 15, 2011, GERMAIN signed off on rough inspections for the insulation, interior and exterior lathing, and drywall at the 43rd Street property, so that the permit cards now reflected the work completed at the 43rd Street property. GERMAIN dated the permit cards "1/27/11 VERBAL," and below that, "2/15/11" and GERMAIN's signature.

40.   Later during the same meeting, UC asked GERMAIN about the stop work order LADBS issued for the 43rd Street property. GERMAIN told UC, "Don't worry about it," and instructed him to "you can go ahead and continue" work on the property. GERMAIN told UC that he could ignore any telephone calls from LADBS management and, should any other inspector, come to the property, UC should tell the inspector that UC had spoken with GERMAIN and had been instructed to "keep on going." GERMAIN stated that, in that eventuality, he "would talk to [the other inspector]."

41. Later during the same meeting, as GERMAIN and UC were exiting the 43rd Street property, UC brought up the 77th Street and 87th Place properties. GERMAIN took his clipboard from under his arm and asked, "What do you need on that?" Germain instructed UC to call into LADBS' automated telephone appointment system to make appointments for inspections, but that he should "keep on going" with construction, and he would "come by" at some point, "That way, people, if there's any problem, they see that someone's coming by there and looking at it."

42. On February 16, 2011, GERMAIN called UC and left a voicemail message indicating that he wanted to: (a) give an "update" on what was going on"; and (b) get "on the same page" as UC. UC returned GERMAIN's call later that day. The conversation was audio-recorded. I have listened to the recording. UC informed GERMAIN that he wanted to meet with him and his supervisor the next day at LADBS' office. GERMAIN stated that he did not want UC to come into the office and instead wanted to meet UC at a Mexican restaurant named Taqueria Tijuana, near the intersection of Florence Avenue and Broadway, in South Los Angles. GERMAIN stated that he wanted to "go over everything."

43. Later in the morning of February 17, 2011, GERMAIN met UC in the street outside Taqueria Tijuana. GERMAIN and UC got into the cab of UC's truck. The ensuing meeting was audio and video-recorded, and I have reviewed the audio/video recording. During the meeting, GERMAIN questioned UC about the 43rd Street

property inspection cards that GERMAIN had signed on the morning of January 21, 2011 while at the 87th Place property:  "Remember when I signed the form for the rough?  . . .  They were done, right?"

44.   GERMAIN proceeded to instruct UC on how, by falsifying records on the 43rd Street permit cards and making false statements in response to any questioning, they could conceal the fact that he had never performed certain inspections at the 43rd Street property.  GERMAIN then wrote out the false cover story, informing UC, "This is for you.  Because this is what I'm telling them.  . . . And this is what we're going to stick to." Thereafter, GERMAIN instructed that, in response to any official inquiry, UC should falsely state that the property had been ready for rough inspections, but UC had failed to make a timely appointment in LADBS' automated telephone appointment system (i.e., prior to 4:00 p.m. the day before the inspection). GERMAIN stated that he would say that, on January 27, 2011, he: (a) happened to be at the property in response to a complaint from a "neighbor (unidentified)" about trash on the property; (b) saw UC, who informed him that he had not timely scheduled rough inspections; (c) completed the rough inspections and "gave verbal approval" so UC could continue with the stucco and drywall, with the intention of entering the approvals in the LADBS computer database.  GERMAIN stated, "This is something you have to remember.  Can you read all this?  Now I'm telling them . . .

22

that [GERMAIN] didn't go in on Friday" and then "forgot to enter
the results from [Thursday]" when GERMAIN returned to the office
the following Monday.  GERMAIN stated, "This is it," told UC not
to "worry about it . . . That's the story right there," and
stated that any LADBS inquiry about the 43rd Street property was
"going to go nowhere."  Later during the same meeting, GERMAIN
discussed being essentially immune from discipline by LADBS.
GERMAIN stated that he could not be terminated or, as a practical
matter, reassigned to a less desirable area.  "It's hard to find
anybody that wants to take this area ... What are they going to
do to punish you?  Send you to South Central?  Because this is
it."  GERMAIN later provided the written version of the false
cover story to UC.  A copy of the document authored by GERMAIN
and given to UC is attached hereto as Exhibit E.

//
//
//
//
//
//
//
//
//
//
//

CONCLUSION

45.  Based upon the foregoing, I submit that there is probable cause to believe that GERMAIN has violated 18 U.S.C. § 666(a)(1)(B), Bribery Concerning Programs Receiving Federal Funds, as alleged in the criminal complaint appended hereto, and I request the issuance of a warrant for GERMAIN's arrest on that charge.

TERESA L. BRAND
Special Agent
Federal Bureau of Investigation


Sworn to and subscribed before me
this ____ th day of April 2011.


THE HONORABLE STEPHEN J. HILLMAN
CHIEF UNITED STATES MAGISTRATE JUDGE

24

# EXHIBIT A



# INSPECTION RECORD

**For use by cashier only**

```
2010LA56079
10/05/10 15:32:31
LA06 T-184563 C 49
100141000102496
```

**PERMIT #** ☐☐☐☐☐☐ - ☐☐☐☐☐ - ☐☐☐☐☐

**ADDRESS**

**JOB DESCRIPTION**

## INSPECTION RECORDS AND PLANS MUST BE AVAILABLE WHEN REQUESTED

### GRADING INSPECTIONS

| TYPE | DATE | INSPECTOR |
|---|---|---|
| Initial Grading | | |
| Toe or Bottom | | |
| Soils Report Approved | | |

**DO NOT PLACE FILL UNTIL ABOVE IS SIGNED**

| | | |
|---|---|---|
| Backfill | | |
| Fill | | |
| Excavation | | |
| Drainage Devices | | |
| Rough Grading | | |
| Approved Compaction Report | | |

### FOOTING INSPECTIONS

| | | |
|---|---|---|
| Footing Excavation | | |
| Forms | | |
| Reinforcing Steel | | |

### GROUNDWORK INSPECTIONS

| | | |
|---|---|---|
| Electrical | | |
| Plumbing | | |
| Gas Piping | | |
| Heating & Refrigeration | | |
| Disabled Access | | |
| OK to Place Floor | | |

**DO NOT PLACE FLOOR UNTIL ABOVE IS SIGNED**

### ROUGH INSPECTIONS

| | | |
|---|---|---|
| Electrical | | |
| Electrical Life Safety | | |
| Plumbing | | |
| Fire Sprinkler | | |
| Heating & Refrigeration | | |
| Roof Sheathing | | |
| Framing | | |
| Insulation | | |
| Disabled Access | | |
| Elevator | | |
| Suspended Ceiling | | |
| OK to Cover | | |

### DO NOT COVER UNTIL PREVIOUS IS SIGNED

| | | |
|---|---|---|
| Exterior Lathing | | |
| Interior Lathing | | |
| Drywall | | |

**DO NOT COVER UNTIL ABOVE IS SIGNED**

### WORK OUTSIDE OF THE BUILDING

| | | |
|---|---|---|
| Electrical Underground | | |
| Gas | | |
| Heating & Refrigeration | | |
| Sewer | | |
| Disabled Access | | |

### POOL INSPECTIONS

| TYPE | DATE | INSPECTOR |
|---|---|---|
| Excavation | | |
| Reinforcing Steel | | |
| Bonding | | |
| Piping | | |
| Pre-Gunite | | |
| Deck | | |
| Enclosure/Fence | | |
| Pool/Spa Cover | | |

**DO NOT FILL POOL UNTIL ABOVE IS SIGNED**

### FINAL INSPECTIONS

| | | |
|---|---|---|
| Electrical | | |
| Electrical Life Safety | | |
| Plumbing | | |
| Gas | | |
| Gas Test | | |
| Heating & Refrigeration | | |
| Elevator | | |
| Fire Sprinkler | | |
| Disabled Access | | |
| LAFD (Title 19 only) | | |
| LAFD Fire Life Safety | | |
| Pool Final | | |
| AQMD sign-off provided | | |
| PROJECT FINAL | | |

## FOR INSPECTION REQUESTS, PLEASE CALL
# 1-(866) - 4LA-CITY (452-2489)

**AQMD Sign-Off Required**   ☐ YES   ☐ NO

# EXHIBIT B

EXHIBIT C







# EXHIBIT D





# EXHIBIT E

THURS:

1-27-11 WENT OUT FOR COMPLAINT
(NOON)        FROM NEIGHBOR (UNIDENTIFIED))

SAW CONTRACTORS SAID HE WAS TOO
LATE (WED EVE) TO SCHED. LATH/INSUL.

SINCE GERMAIN WAS THERE COULD
HE DO THE INSP SO CONTRACTOR
COULD CONT. W/ STUCCO/DRYWALL
GERMAIN GAVE VERBAL APPROVAL
AND SAID HE WOULD ENTER RESULTS
ON FRIDAY.

_____

GERMAIN DIDN'T GO IN OF FRIDAY (1/28)
& NEVER ENTERED RESULTS FROM
THURS.
MONDAY GERMAIN FORGOT TO ENTER
RESULTS FROM THURS.